UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JF, Individually and on behalf of DF, a Minor,

     Plaintiff,

 -against-

CARMEL CENTRAL SCHOOL DISTRICT;
RYAN DALL, Individually; KEVIN CARROLL,
Individually; and JOHN FINK, Individually.

     Defendants.

---

OPINION & ORDER

13-cv-8830 (NSR)

NELSON S. ROMÁN, United States District Judge

  Plaintiffs JF and DF bring this action against Defendants Carmel Central School District

(the "School District"), Ryan Dall, Kevin Carroll, and John Fink alleging violations of the due

process and equal protection clauses of the Fourteenth Amendment, and Title VI of the Civil

Rights Act of 1964, 42 U.S.C. § 2000d, as well as state law claims for breach of contract,

negligence, assault, and battery.

  Defendants now move for summary judgment on Plaintiffs' federal claims and request

that this Court decline to exercise supplemental jurisdiction over the remaining state law claims.

For the following reasons, Defendants' motion is GRANTED and the Court declines to exercise

jurisdiction over the remaining state law claims.

## BACKGROUND

  The following facts are taken from the Complaint and the parties' respective Local Civil

Rule 56.1 submissions, exhibits, and affidavits.

  At the time the Complaint was filed, DF was a sophomore at Carmel High School in

Carmel, New York. (Compl. ¶¶ 3-4.) DF is African-American. (*Id.* ¶ 80.) JF is DF's father.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/2/2016

(*Id.* at ¶ 2.)  Ryan Dall was a social studies teacher at Carmel High School at the time of the

events in question.  (*Id.* ¶ 5.)  During the same time period, Kevin Carroll and John Fink were

the Principal and Assistant Principal of Carmel High School, respectively.  (*Id.* ¶¶ 6-7.)

The events at issue occurred on or about September 24, 2012 and February 26, 2013.

Plaintiffs also reference additional events in their opposition papers and related submissions that

occurred after the filing of the Complaint.  The relevant events are summarized below.

1.  The Events of September 24, 2012

On September 24, 2012, DF and another student, JM, were involved in a fight at Carmel

High School.  Although DF claims that JM initiated the fight by shoving him, DF admits that he

threw the first punch, hitting JM in the face.  (Pls.' 56.1[1] ¶¶ 17[2]-18; Declaration of Maurizio

Savoiardo, Docket No. 35 ("Savoiardo Decl."), Ex. E, at 96:12-13.)

The fight arose "over a girl" named Nicole, who DF previously dated.  (Savoiardo Decl.,

Ex. E, at 75:10-15; Pls.' 56.1 ¶ 12.)[3]  DF sent text messages to JM at some point prior to the

fight, instructing JM to "[t]ell your girl don't disrespect me . . . or we're going to have

problems."  (Savoiardo Decl., Ex. E, at 79:13-18.)  DF does not recall, however, why he felt

disrespected by Nicole.  (*Id.* at 78:5-9.)  In those same text messages, DF threatened to harm JM

---

[1] Plaintiffs' 56.1 Statement is deficient in many respects, requiring the Court to deem a significant number of Defendants' statements of fact admitted for purposes of this motion.  First, many of Plaintiffs' denials do not specifically controvert Defendants' proposed undisputed statements of fact and are largely unresponsive to Defendants' assertions.  Second, at least some of the evidence cited by Plaintiffs is either (1) not included in the record before the Court or (2) does not support the contradictory statements made by Plaintiffs.  Statements falling into these categories will be deemed admitted for purposes of this motion pursuant to Loc. Civ. R. 56.1(c)-(d).  Finally, Plaintiffs assert in response to a number of Defendants' statements that they do not have the specific knowledge or information necessary to admit or deny the statement.  Such responses function as admissions under Loc. Civ. R. 56.1.  *See Universal Calvary Church v. City of New York*, No. 96 CIV. 4606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); *Aztar Corp. v. NY Entertainment, LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998).

[2] Plaintiffs do not specifically deny that DF threw the fight punch, instead stating that JM "initiated the first contact."  In any event, Plaintiffs' cited evidence has not been submitted to the Court.

[3] Although Plaintiffs deny this fact, it is directly contradicted by DF's sworn testimony.  Moreover, Plaintiffs' cited evidence has not been submitted to the Court.

in various ways; threatened to steal his belongings; and attempted to extort money from him in exchange for not seriously harming him.  (*See* Savoiardo Decl., Ex. M (DF wrote: "u deserve a good ass kicking"; "ima break ur bones"; "u either getting ur ass kicked or coughing up 500dollars two options pick now"; "I been waiting to beat that ass how they gonna like u with 2 teeth; "I'm taking ur shoes phone chains everything breaking ur shit lil bitch".))[4]

After the fight was broken up, Assistant Principal Fink escorted DF back to his office. (Pls.' 56.1 ¶ 19.)  Once there, Fink asked DF what happened; why it happened; if DF was ok; and if DF wanted to see the nurse.  (*Id.* ¶ 22.)  Although the parties dispute whether DF admitted to Fink that he searched for JM and instigated the fight, (*id.* ¶ 23), and whether DF stated that the fight would not be over until he put JM in the hospital, (*id.* ¶ 26), DF admitted that he sent threatening text messages to JM prior to the fight.  (Pls.' 56.1 ¶ 24; *see also* Savoiardo Decl., Ex. E, at 79:13-18, Ex. M.)[5]

Fink then decided to search DF and his backpack, purportedly as a result of DF's continued threats to harm JM.  (Pls.' 56.1 ¶ 52.)[6]  After searching DF's backpack, Fink informed DF that he was going to search his person.  (Pls.' 56.1 ¶ 54.)  DF protested, at which time Deputy Sheriff Claire Pierson, the Carmel High School Resource Officer, informed DF that she and Fink had the right to search him.  (*Id.* ¶¶ 51, 57, 58.)  At this point, Pierson claims that DF handed her

---

[4] Although DF denies sending these text messages in a sworn affidavit, (*see* Affidavit of DF, Docket No. 42, ¶¶ 3-5) the Court finds that no reasonable juror could conclude that he did not send the text messages.  The first message in the chain of text messages matches DF's sworn testimony describing the message he sent to JM; the text messages were sent from DF's cellular phone number, (*see* Savoiardo Decl., Ex. E, at 84-85); DF testified that no one else had access to his phone at the time, (*id.*); and DF only provides a hypothetical and conclusory reason as to why he did not send the text messages.  (*See* Affidavit of DF ¶ 5 ("I understand that it is possible to send text messages from a computer, where the sender can state any phone number he or she desires as the outgoing number.")  Plaintiffs fail to point to any evidence in the record that the text messages were falsified or tampered with, leaving the Court with only DF's self-serving, hypothetical, and conclusory statements, which the Court will not credit in deciding this motion.

[5] Although Plaintiffs deny this fact, their cited evidence does not contradict Defendants' statement.

[6] The Court is aware that Plaintiffs dispute whether DF continued to threaten harm to JM.

a pair of pliers from his pocket. (*Id.* ¶ 59.) DF claims that Pierson shoved her hand into his pocket and removed the pliers. (*Id.* ¶ 60.)

DF was ultimately suspended for five days for assaulting JM. (Pls.' 56.1 ¶¶ 10[7], 68.) JM was not suspended, as the School District determined he was not at fault. (*Id.* ¶ 69.)

2.   The Events of February 26, 2013

On February 26, 2013, DF was searching Carmel High School for his cellular phone. (*Id.* ¶¶ 80, 83.) DF attempted to enter a class in which he was not currently a student, but was stopped by Ryan Dall, a teacher who was on hall monitor duty at the time. (*Id.* ¶¶ 80-81.) Dall asked DF whether he was a student in the class and DF responded that he was not. (*Id.* ¶¶ 82-83.) Dall then instructed DF to return to his current class. (*Id.* ¶ 84.)

DF refused to return to class, prompting Dall to position himself between DF and the classroom door. (*Id.* ¶ 85.) The parties dispute whether Dall then shoved DF multiple times or merely put his arm in between DF and the door. (*Id.*) Next, Dall purportedly informed the class' teacher, Ms. Flynn, not to let "this boy" – referring to DF – into the classroom. (*Id.* ¶ 88.) DF asserts that Dall called him "boy" in a pejorative and discriminatory manner. (Compl. ¶ 41.) When Dall attempted to close the door after speaking to Ms. Flynn, DF stuck his foot in the doorway to keep it open. (Pls.' 56.1 ¶ 89.)[8] Dall then purportedly "guided" DF back with his arm to shut the door. (*Id.* ¶ 90.) DF jumped back and told Dall to take his hands off of him. (*Id.*)

Principal Carroll interviewed Ms. Flynn after the incident, who stated that she did not see Dall touch DF in any way or speak inappropriately to him. (*Id.* ¶¶ 91-93.)

---

[7] Plaintiffs do not specifically deny that DF assaulted JM and do not cite to evidence that contradicts Defendants' statement.

[8] Although Plaintiffs deny this fact, their cited evidence does not contradict Defendants' statement.

3.   The Events of March 11, 2014

On March 11, 2014, JM sent DF a text message in which he used a racial slur to refer to DF.  (*Id.* ¶ 94.)  After receiving the text message, DF entered the classroom in which JM was sitting and punched him.  (*Id.* ¶ 96.)  DF was suspended for five days for punching JM; JM was suspended for two days for using a racial slur.  (*Id.* ¶¶ 97-98.)

4.   Events Involving Ms. Romanovsky

Two incidents involving DF's science teacher, Ms. Romanovsky, are at issue in this matter.  The dates on which these incidents occurred are not clearly stated in the parties' submissions.

First, Romanovsky purportedly accused DF of cheating because DF finished his exam before every other student in his class.  (*Id.* ¶¶ 70-71, 146.)  Despite her accusation, DF passed the class and was never disciplined for cheating.  (*Id.*)

Second, DF claims that Romanovsky would not let him go to the bathroom during class, while permitting other students to do so.  (*Id.* ¶ 145.)  This refusal followed purported accusations by Romanovsky that DF took too long to return from the nurse's office after obtaining a medical note for gym class.  (*Id.* ¶ 73.)  DF did not recall how long he was out of class when he went to the nurse's office.  (*Id.* ¶ 74.)  Neither DF nor his father could recall whether they ever made an allegation that this treatment was a result of DF's race.  (*Id.* ¶ 75.)  DF was not disciplined as a result of this incident.  (*Id.* ¶ 78.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).  The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted).  Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

### 1. *Monell* Liability

Plaintiffs allege Fourteenth Amendment procedural due process and equal protection claims against the School District.  It is well settled, however, that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Rather, a municipal entity can only be held vicariously liable under § 1983 if the "execution of the government's policy or custom . . . inflicts the injury." *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978).  Thus, *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were

performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d

206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692-94.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a

municipal entity.  *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (internal

citation omitted).  First, the plaintiff must "prove the existence of a municipal policy or custom

in order to show that the municipality took some action that caused his injuries beyond merely

employing the misbehaving officer."  *Id*. (internal citation omitted).  Second, the plaintiff must

establish a "'direct causal link between a municipal policy or custom and the alleged

constitutional deprivation.'"  *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 439 (S.D.N.Y.

2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

> To satisfy the first requirement, a plaintiff must allege the existence of:
>
> (1) a formal policy which is officially endorsed by the municipality; (2) actions
> taken or decisions made by government officials responsible for establishing
> municipal policies which caused the alleged violation of the plaintiff's civil
> rights; (3) a practice so persistent and widespread that it constitutes a custom or
> usage and implies the constructive knowledge of policy-making officials; or (4) a
> failure by official policy-makers to properly train or supervise subordinates to
> such an extent that it amounts to deliberate indifference to the rights of those with
> whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation

marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y.

2010) (quoting *Moray* and updating citations to cases).  A plaintiff is not required to identify an

express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal

policy from acts or omissions of the municipality's policy makers, but in the absence of other

evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal

policy caused plaintiff's injury."  *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987); *see*

*also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint,

especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability") (internal citation omitted). "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

Plaintiffs' Complaint and opposition to the instant motion is littered with references to the School District's purported policies or customs, but as far the Court can discern Plaintiffs point to five pieces of evidence to demonstrate that the School District had a policy or custom of discriminating against African-American students. (Pls.' Opp. at 19, 20-22.) The evidence includes: (1) the fight between DF and JM, which occurred on September 24, 2012, for which JM was not suspended; (2) "racial remarks" made by one student to DF and another student on January 26, 2012, where the offending student "received only an in-school suspension, which shows indifference to this severe offense," (*id.* at 22); (3) Assistant Principal McKiernan's purported testimony in this matter "that everyone has some racism inside of them," (*id.*); (4) the fight between DF and JM on March 11, 2014, purportedly precipitated by JM's use of a racial slur, for which JM was suspended from school for two days; and (5) Ms. Romanovsky's refusal to permit DF to use the bathroom during her class on one occasion. *Id.*

Regardless of the veracity of Plaintiffs' assertions, there is simply insufficient evidence in the record for a reasonable jury to determine that the School District's conduct was so "persistent

and widespread . . . [and] so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).  At best, Plaintiffs assert that the record contains five isolated instances of purportedly discriminatory conduct.  Plaintiffs' failure to show a persistent and widespread course of conduct is, on its own, sufficient to dismiss this claim as a matter of law.  *Id.* at 870.

Moreover, reviewing each incident makes it even clearer that Plaintiffs cannot demonstrate the existence of a municipal policy or custom.  First, it is undisputed that the School District found JM was not at fault in the altercation.  (Pls.' 56.1 ¶ 69.)  There is absolutely no evidence in the record indicating that JM's lack of suspension had anything to do with his race. Second, with respect to the students who made racial remarks referenced by Plaintiffs, it is undisputed that the School District suspended each of the students.  Although Plaintiffs argue that the discipline was not severe enough, there is no evidence in the record that any African-American students (or minority students for that matter) were ever disciplined more severely than white students for the same conduct.  Third, Plaintiffs' allegation with respect to Ms. Romanovsky's refusal to permit DF to use the bathroom involved only one instance of conduct by an individual who is clearly below the policy-making level in the School District.  And fourth, even assuming that Assistant Principal McKiernan's testimony "that everyone has some racism inside of them" was not taken out of context by Plaintiffs, which it appears to have been,[9] this quote alone provides absolutely no evidence of any policy or custom of treating African-American students differently than white students in the School District.

_____
[9] McKiernan testified that the statement related to an incident that occurred during a basketball game between Mahopac High School and Mount Vernon High School.  (Reply Declaration of Maurizio Savoiardo, Docket No. 49, Ex. B. 67-68.)

Accordingly, Plaintiffs have failed to demonstrate that a reasonable jury could determine that the School District had a municipal policy or custom of discriminating against African-American students.  Plaintiffs' § 1983 claims against the School District are therefore dismissed.

## 2.  Procedural Due Process

Next, Plaintiffs assert a procedural due process claim under the Fourteenth Amendment for "damages for the search [of DF] against protocol."  (Pls.' Opp. at 13.)  Plaintiffs allege that "DF was entitled to be searched fairly, with a witness present, per the established protocol of Defendant School District."  (Compl. ¶ 56.)  Plaintiffs clarify their claim in their opposition to the instant motion, stating that they only "[c]hallenge the search, [n]ot the suspension," (Pls.' Opp. at 27), and that Defendants "had no valid reason for searching Plaintiff DF's backpack."  (*Id.* at 28.)  Plaintiffs conclude that there is "an issue of fact as to whether or not Defendant District and Defendant Fink had the right to search Plaintiff DF's backpack or direct a search of Plaintiff DF's person."  (*Id.*)

Although it appears that Plaintiffs may have sought to challenge the validity of the search, the Complaint is devoid of any reference to the Fourth Amendment.  Instead, Plaintiffs frame their claim as one for a violation of procedural due process under the Fourteenth Amendment for a violation of the "established protocol" of searching students "with a witness present."  (*See* Compl. ¶¶ 8, 55-61.)  While the Second Circuit has instructed the district courts to construe pleadings liberally in some circumstances, particularly when the plaintiff is *pro se*, it has not afforded the same standard to attorneys, even when the attorney is proceeding *pro se*. *See Smith v. New York Presbyterian Hops.*, 254 Fed. App'x 68, 70 (2d Cir. 2007) ("licensed attorneys proceeding *pro se* need not be afforded the same" liberal standard).  In light of the lack

of any reference to the Fourth Amendment in the Complaint, and because Plaintiffs are represented by counsel, the Court will evaluate this claim as one for violations of the procedural due process clause of the Fourteenth Amendment, as pled by counsel.

A procedural due process claim requires proof of two elements: "(1) the existence of a property or liberty interest that was deprived; and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dept.*, 692 F.3d 202, 218 (2d Cir. 2012).  The Second Circuit instructs:

> The threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution. *See Board of Regents v. Roth*, 408 U.S. 564 (1972).  If a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process.  The second step of the analysis thus asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review.  *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

*Narumanchi v. Board of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988).

Plaintiffs must first allege a property or liberty interest protected by the Constitution. *Narumanchi*, 850 F.2d at 72.  As Plaintiffs are not contesting the seizure of DF's property or his suspension from school, the Court construes Plaintiffs' claim as one for a deprivation of DF's liberty interest to be free from unreasonable searches and seizures.  There is no question that such a liberty interest exists under the Fourth Amendment.  *See, e.g.*, *Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 292 (E.D.N.Y. 1998) *aff'd*, 235 F.3d 749 (2d Cir. 2000) ("The Fourth Amendment prohibition against unreasonable searches and seizures is the quintessential safeguard of one's liberty." (citing *Albright v. Oliver*, 510 U.S. 266, 274 (1994); *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997))).

Having determined that Plaintiffs assert a liberty interest, the Court must decide what process was due to DF prior to Defendants undertaking the search, and whether that process was

12

provided.  "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (1) claims based on established state procedures and (2) claims based on random, unauthorized acts by state employees." *J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 545-46 (E.D.N.Y. 2012) (citing *Hudson v. Palmer*, 468 U.S. 517, 532 (1984); *Hellenic Am. Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 881-82 (2d Cir. 1996)).  "Where the alleged deprivation is based on random, unauthorized acts, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of liberty, 'so long as the state provides a meaningful postdeprivation remedy.'" *Id.* (citing *Hellenic Am. Neighborhood Action Committee v. City of New York*, 101 F.3d at 880.)  Simply put, "[d]ue process requires only that a hearing be held at a meaningful time and in a meaningful manner." *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 540 (1981)).

Plaintiffs fail to identify any law or rule requiring that DF be afforded a hearing prior to Defendants undertaking a search of his backpack or person.  (Pls.' Opp. at 27-28.)  The Court is likewise unaware of any such requirement.  In light of the circumstances faced by school officials prior to undertaking a search of a student after a violent altercation, and particularly in light of the undisputed facts in this case – that DF threatened serious physical harm to JM and attempted to follow through with those threats – a pre-deprivation hearing would have been impractical, and essentially impossible, in order to ensure the safety of the other student involved in the fight.  Moreover, the alleged deprivation at issue did not occur based on established state procedures, but rather, as Plaintiffs allege, arose from a purportedly unauthorized search of DF's backpack and person.  The Court can think of no other way to characterize this allegation than as a random and unauthorized act of a school official.  Thus, the Court will focus on whether a

postdeprivation hearing was available in this case.

"Students in New York schools . . . have frequently sought relief from disciplinary action through an Article 78 hearing." *Attallah v. New York Coll. of Osteopathic Med.*, 94 F. Supp. 3d 448, 455 (E.D.N.Y. 2015); *see also* N.Y. C.P.L.R. §§ 7801-7806.  In situations when it would have been impracticable to hold a hearing prior to the alleged deprivation of liberty or property, the Second Circuit has held that the Article 78 hearing process satisfies the requirements of procedural due process. *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880-81 (explaining that where, as here, it is impracticable and essentially impossible to hold a hearing before the alleged deprivation, "the Due Process Clause of the Fourteenth Amendment is not violated . . . so long as the State provides a meaningful postdeprivation remedy . . . [such as] an Article 78 proceeding.")  Despite the Court being unaware of any cases concerning the availability of an Article 78 proceeding to review a school official's justification for searching a student on school premises, Article 78 has been routinely used to challenge the decisions of school officials. *Attallah*, 94 F. Supp. 3d at 455-56 (collecting cases).  The Court can see no reason why Plaintiffs could not have pursued an Article 78 proceeding in this matter.

Here, Plaintiffs failed to avail themselves of the Article 78 hearing process.  Although Plaintiffs correctly argue that they need not have exhausted their § 1983 claims prior to bringing suit, "[e]ntirely consistent with that general rule is the principle that there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty." *Federico v. Bd. of Educ. of Pub. Sch. of Tarrytowns*, 955 F. Supp. 194, 202 n.4 (S.D.N.Y. 1997) (internal citations and quotation marks omitted) (emphasis in original).  Accordingly, Plaintiffs could have, and should have, availed themselves of the Article 78 hearing process.  Its availability is therefore

fatal to their procedural due process claim.

Accordingly, Defendants are granted summary judgment on Plaintiffs' procedural due process claim.

### 3. Equal Protection

Plaintiffs assert two claims under the Equal Protection Clause of the Fourteenth Amendment, the first arising out of searches of DF conducted by Fink and DF's subsequent suspension from school on September 24, 2012, (Compl. ¶¶ 62-70), and the second arising out of Dall's purportedly racist comments made to DF on February 25, 2013.  (*Id.* ¶¶ 78-84.)

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (internal citations and quotation marks omitted).  A plaintiff may plead intentional discrimination in violation of the Equal Protection Clause in a number of ways, including pointing to a specific law or policy that expressly or in practice discriminates on the basis of some impermissible consideration such as race, *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999)), or by basing its allegations on theories of selective enforcement or a "class-of-one."  *See Witt v. Vill. of Mamaroneck*, No. 12 Cv. 8778 (ER), 2015 WL 1427206, at *4 (S.D.N.Y. Mar. 27, 2015).

Plaintiffs have not specifically identified under which theory they are proceeding, but in opposition to the instant motion assert only that there are facts in dispute requiring a trial on their selective enforcement claim.  The Court therefore presumes that Plaintiffs are proceeding on a selective enforcement theory.  To succeed on a theory of selective enforcement, a plaintiff must prove that: "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race,

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980).

Therefore, as an initial matter, Plaintiffs must show that similarly situated individuals were treated differently.  There is, however, "disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order to adequately allege an equal protection claim under the selective enforcement theory." *Witt*, 2015 WL 1427206 at *5 (internal citation omitted). *See also Missere v. Gross,* 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011).  Some courts in this Circuit have applied the "class-of-one" similarly situated standard to selective enforcement claims, requiring a plaintiff to show that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).  Other courts have applied a "slightly less stringent" standard to selective enforcement claims, requiring a plaintiff to "show that the comparators are 'similarly situated in all material respects.'" *Witt*, 2015 WL 1427206 at *5 (citing *Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 696).  In applying the less stringent standard to a selective enforcement claim, the court in *Mosdos Chofetz Chaim* explained:

> An extremely high level of similarity is required in the "class of one" context because plaintiffs asserting those claims are attempting to prove that the government's treatment was arbitrary and irrational.  However, in the present case, Plaintiffs are not alleging that Defendants sued them . . . to block the . . . project for no reason at all; instead, they have specifically and repeatedly alleged that Defendants have targeted their project because [of their religion]. . . . Accordingly, the Court believes it is appropriate to utilize a less stringent standard than would apply if Plaintiffs were claiming there was simply no rational reason for the disparate treatment.

815 F. Supp. 2d at 696-97.  For the same reasons, the Court follows *Mosdos Chofetz Chaim* and other cases in this Circuit that have applied a less stringent standard to selective enforcement claims.  *See*, *e.g.*, *Walker v. City of New York*, No. 05 Cv. 1283 (RER), 2010 WL 5186779, at *7 (E.D.N.Y. Dec. 15, 2010); *Abel v. Morabito*, No. 04 Cv. 07284 (PGG), 2009 WL 321007, at *4 (S.D.N.Y. Feb. 10, 2009).  Therefore, Plaintiff "must identify comparators whom a 'prudent person would think . . . [were] roughly equivalent.'"  *Abel*, 2009 WL 321007 at *5 (quoting *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004)) (alterations in original).

Plaintiffs identify only one individual – JM – as the comparator for their selective enforcement claims.  (Pls.' Opp. at 14, 19.)  In sum and substance, Plaintiffs assert that DF and JM are similarly situated individuals because they both "engaged in a fight after exchanging words" and neither "student clearly instigated the fight."  (*Id.* at 20.)  Plaintiffs' assertion is based, at least in part, on their assumptions that DF neither instigated the fight nor made additional threats to JM.  (*Id.*)  Defendants counter that DF and JM are not similarly situated for equal protection purposes because: (1) JM only shoved DF, and DF threw the first punch; (2) DF sent threatening text messages to JM prior to the fight; and (3) DF admitted to instigating the fight.  (Defs.' Reply at 1-2.)

Prior to initiating this action, DF testified under oath in a hearing pursuant to N.Y. Gen. Mun. Law § 50-h.  In that hearing, DF testified that the fight was precipitated by text messages he sent to JM: "I texted him . . . I said basically, 'Tell your girl don't disrespect me' . . . 'or we're going to have problems.'"  (Savoiardo Decl., Ex. E, at 79:12-18.)  Although DF now attempts to deny that he sent any text messages to JM prior to the fight, (*see* Affidavit of DF, ¶¶ 3-5)[10], the

---

[10] DF's Affidavit directly contradicts his sworn testimony.  The Court notes its concern that DF's counsel, Jonathan M. Victor, would permit DF to submit a seemingly false affidavit without any reference therein to the conflicting testimony proffered by DF in the 50-h hearing.  At a minimum, counsel has not shown the candor this Court expects from members of its bar.  In any event, DF's self-serving statements, which directly contradict his

text messages submitted to the Court were sent from DF's cellular phone number, of which he

was the only user, (*see* Savoiardo Decl., Ex. E, at 84-85), and match DF's earlier testimony.  (*See*

Savoiardo Decl., Ex. M (DF wrote, "I'm on the verge to hurting u control ur bitch b4 I do I'm

not playing no games she disrecpts me u get hurt u hear me don't look in my face u see me u

better walk real quick u deserve a good ass kicking just for her"[sic]).)  DF also testified in the

same hearing that when he saw JM in school after sending the text messages, DF "said

something to [JM]," and JM then pushed him.  (*Id.*, Ex. E, at 79:19-24; Pls.' 56.1 ¶ 12.)

Moreover, DF admits to throwing the first punch.  (Savoiardo Decl., Ex. E, at 96:12-13; Pls.'

56.1 ¶ 25.)

Construing the proffered evidence in the light most favorable to Plaintiffs, the Court

cannot find that DF and JM are similarly situated in all material respects or that they are even

"roughly equivalent," *see Abel*, 2009 WL 321007 at *5, with respect to the underlying incidents

alleged in Plaintiffs' equal protection claims.  On the one hand, the record clearly demonstrates

that DF sent threatening text messages to JM, which instigated the fight, and that DF threw the

first punch.  On the other hand, the record reflects only that JM pushed Plaintiff; he did not send

threatening text messages,[11] instigate the fight, or throw the first punch.  Although both DF and

JM were involved in the fight, there is substantial difference between their levels of culpability,

such that a prudent person could not find that DF and JM were roughly equivalent given the

premeditated nature of the incident and DF's throwing of the first punch.

---

prior sworn testimony, are insufficient to defeat a motion for summary judgment. *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

[11] Although DF states in his Affidavit that he "thought JM had threatened to break [his] kneecaps," (Affidavit of DF ¶ 7), the Court will not give credence to this self-serving statement, unsupported by any other evidence in the record.  *See* Footnote 2, *supra*.

Plaintiffs' failure to identify a sufficient comparator is fatal to their equal protection claim arising out of the search and suspension that occurred on September 24, 2012.  Moreover, Plaintiffs fail to identify any comparator for their claim arising out of Dall's purportedly racist comments to DF on February 25, 2013.  Accordingly, Defendants are granted summary judgment on Plaintiffs' equal protection claims.[12]

## 4.  Title VI

Title VI of the Civil Rights Act of 1964 prohibits programs receiving financial assistance from the federal government from discriminating on the basis of race or national origin.  *See* 42 U.S.C. § 2000d.  "To establish a claim under Title VI, a plaintiff must show . . . : (1) that the entity involved engaged in racial or national origin discrimination; (2) the entity involved is receiving federal financial aid; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid."  *Babiker v. Ross Univ. Sch. of Med.*, No. 98 CIV 1429 THK, 2000 WL 666342, at *4 (S.D.N.Y. May 19, 2000) *aff'd sub nom. Babiker v. Ross Univ. Sch. of Med.*, 86 F. App'x 457 (2d Cir. 2004) (internal citations omitted).

Courts apply the three-part burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to Title VI claims, *see J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 557 (E.D.N.Y. 2012), which requires:

> [a] plaintiff [to] first successfully assert a prima facie claim against defendants.  If plaintiff makes out a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for its conduct.  Plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* (quoting *Koumantaros v. City University of New York*, No. 03 Civ. 10170(GEL), 2007 WL 840115, at *7 (S.D.N.Y. Mar. 19, 2007)).  In order to satisfy the first element of a Title VI claim,

---

[12] Having granted Defendants' motion on Plaintiffs' § 1983 due process and equal protection claims, the Court need not determine whether any of the Defendants are entitled to qualified immunity.

Plaintiffs must demonstrate "that the defendant discriminated against [DF] on the basis of race, that the discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant's actions." *Id.* at 556 (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (internal quotation marks and citations omitted)).  Plaintiffs may assert a prima facie case through direct evidence of discrimination, or when there is no direct evidence of discriminatory conduct, they may show that: (1) [DF] is a member of a protected class; (2) []he suffered an adverse action in pursuit of h[is] education by defendant; (3) []he was treated differently from similarly situated students who were not members of the protected class; and (4) []he was qualified to continue in h[is] educational pursuit." *Id.* at 557.

Plaintiffs' Title VI claims arise from the same set of facts alleged in Plaintiffs' equal protection claims – the searches of DF conducted by Fink and his subsequent suspension from school on September 24, 2012, and Dall's purportedly racist comments made to DF on February 25, 2013.  (*Compare* Compl. ¶¶ 62-70, 78-84 (equal protection claims) *with* Compl. ¶¶ 71-77, 85-93 (Title VI claims).)  Plaintiffs' failure to identify a sufficient comparator in connection with their equal protection claims makes it impossible for them to demonstrate an essential element of their Title VI claim – that DF was "treated differently from similarly situated students who were not members of the protected class." *J.E. ex rel. Edwards*, 898 F. Supp. 2d at 557 (holding that plaintiffs' failure to establish triable issues in their equal protection claims required dismissal of their Title VI claims for the same reasons).  Defendants are therefore entitled to summary judgment on the Title VI claims.[13]

---

[13] The Court notes that Plaintiffs previously withdrew their Title VI claims against the individual Defendants.  (Pls.' Opp. at 13.)

**5.  State Law Claims**

Having granted Defendants summary judgment on all of Plaintiffs' federal claims, the

Court must decide whether to retain supplemental jurisdiction over the remaining state law

claims for breach of contract, negligence, assault, and battery.

Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental

jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has

original jurisdiction."  28 U.S.C. § 1367(c)(3).  In deciding whether to decline jurisdiction, the

Court may "consider factors such as judicial economy, convenience, fairness, and comity."

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d Cir. 1996).  The Supreme

Court has noted, however, "that in the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—

judicial economy, convenience, fairness, and comity—will point toward declining to exercise

jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

343, 350 n.7 (1988); *accord Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003);

*see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal

claims are dismissed before trial, the state claims should be dismissed as well.").

In *J.E. ex rel. Edwards*, the Eastern District of New York faced nearly the same question

in the context of a case involving school fights – whether to retain jurisdiction over the plaintiffs'

negligence, assault, battery, intentional infliction of emotional distress, and New York State

Education Law claims after dismissing their equal protection, procedural due process, and Title

VI claims, among other federal claims.  The court explained that comity suggests such cases

should be "litigated in state court where the conduct of state actors can be adjudicated by the

state court under state law."  *J.E. ex rel. Edwards*, 898 F. Supp. 2d at 559 (internal citations

omitted).  The court further noted that "[t]his is particularly the case here where the conduct at issue involves local interaction between public school officials and students and their parents." *Id.*

Plaintiffs state that this Court may retain jurisdiction over the state law claims as a discretionary matter.  (Pls.' Opp. at 30.)  Although this proposition is correct, Plaintiffs offer no reasons as to why the Court should exercise such discretion in this case or why the Court should depart from the Supreme Court's direction that where, as here, all federal claims are dismissed before trial, the district courts should generally decline to exercise jurisdiction over the remaining state law claims.  In the absence of any supporting arguments by Plaintiffs, and considering New York State's interest in adjudicating matters of state law concerning interactions between public school officials and students and their parents, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  These claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Court declines to exercise jurisdiction over the remaining state law claims.  The Court respectfully directs the Clerk to terminate the motion at ECF No. 34, enter judgment in favor of Defendants, and to close the case.

Dated:   March ___, 2016                          SO ORDERED:
         White Plains, New York

                                        _____
                                        NELSON S. ROMÁN
                                        United States District Judge